STATE OF CONNECTICUT *v.*
GREGORY E. MCLAURIN
(SC 20785)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Dannehy, Clark and Westbrook, Js.*

*Syllabus*

The defendant appealed, on the granting of certification, from the judgment
of the Appellate Court, which had affirmed his conviction of numerous
crimes, including first degree robbery, in connection with his role in an
armed robbery of a restaurant. The perpetrators of the robbery had fled the
restaurant, but the police apprehended the defendant shortly thereafter and
detained him in a nearby parking lot. An officer then transported B, a
restaurant employee who had witnessed the robbery, to the parking lot,
where she identified the defendant as one of the perpetrators. The trial
court denied the defendant's motion to suppress B's identification of the
defendant, reasoning that the one-on-one showup identification procedure
the police used to obtain the identification was not unnecessarily suggestive
and that, even if it was, B's identification was nevertheless reliable under
the totality of the circumstances. On appeal to this court, the defendant
claimed, inter alia, that the Appellate Court, in upholding the trial court's
denial of the defendant's motion to suppress, incorrectly had concluded
that the showup procedure the police used to obtain the identification was
not unnecessarily suggestive. *Held*:

Even if this court assumed that the challenged showup procedure was
unnecessarily suggestive, the trial court correctly concluded that B's identifi-

* This case originally was argued before a panel of this court consisting
of former Chief Justice Robinson and Justices McDonald, D'Auria, Mullins,
Ecker, Alexander and Dannehy. Thereafter, former Chief Justice Robinson
and Justice Alexander were removed from the panel, and the case was
reargued before a panel consisting of Chief Justice Mullins, Justices McDonald, D'Auria, Ecker and Dannehy, and Judges Clark and Westbrook.

352 Conn. 500 JULY, 2025 501

State *v.* McLaurin

cation of the defendant was reliable under all of the relevant circumstances, and, accordingly, the Appellate Court properly upheld the trial court's denial of the defendant's motion to suppress.

Upon review of the record and consideration of the totality of the circumstances, this court concluded that there was substantial evidence in the record to support the trial court's finding that B's identification of the defendant was reliable.

B had the opportunity to view the defendant and his accomplice while they were in the restaurant, B was attentive, insofar as she was able to provide a detailed description of the perpetrators and the robbery, the description that B initially provided of the defendant to the police, before she was brought to identify him, was accurate and matched his general appearance, B demonstrated great certainty when she identified the defendant and did so without any hesitation, and only a short amount of time had elapsed between the commission of the robbery and B's identification of the defendant.

There was no merit to the defendant's claim that the reliability of B's identification was undermined by the application of certain estimator variables, which are factors that stem from conditions over which the criminal justice system has no control and generally arise out of the circumstances under which the eyewitness viewed the perpetrator during the commission of the crime, and which this court identified in *State* v. *Harris* (330 Conn. 91) as additional considerations for evaluating the reliability of an identification under the state constitution.

There was, at best, conflicting evidence regarding whether B was high from smoking marijuana when she identified the defendant, although there was evidence that B was scared, being scared, in and of itself, does not render an identification unreliable, and the evidence did not support the defendant's contention that B was so focused on a gun handled by the perpetrators during the robbery that her identification was rendered unreliable.

Moreover, although the police did not employ a double-blind, sequential identification procedure, the challenged showup procedure occurred within eighty-six minutes of the robbery, and social science has demonstrated that there is no greater likelihood of misidentification when a showup rather than a lineup procedure is employed, so long as the showup identification occurs less than two hours after the witness viewed the perpetrator.

(*Three justices dissenting in one opinion*)

Argued November 15, 2023, and January 29, 2025—
officially released July 22, 2025

*Procedural History*

Substitute information charging the defendant with four counts of the crime of unlawful restraint in the

State *v.* McLaurin

first degree and one count each of the crimes of robbery in the first degree, conspiracy to commit robbery in the first degree, criminal possession of a firearm, carrying a pistol without a permit, larceny in the fourth degree, and conspiracy to commit larceny in the fourth degree, brought to the Superior Court in the judicial district of Ansonia-Milford, where the court, *P. Brown, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the case was tried to the jury before *P. Brown, J.*; verdict and judgment of guilty of four counts of unlawful restraint in the first degree and one count each of robbery in the first degree, conspiracy to commit robbery in the first degree, criminal possession of a firearm, carrying a pistol without a permit, and conspiracy to commit larceny in the fourth degree, from which the defendant appealed to the Appellate Court, *Alvord*, *Seeley* and *DiPentima, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Daniel J. Krisch*, assigned counsel, for the appellant (defendant).

*Nathan J. Buchok*, assistant state's attorney, with whom, on the brief, was *Margaret E. Kelley*, state's attorney, for the appellee (state).

*Opinion*

MULLINS, C. J. A jury found the defendant, Gregory E. McLaurin, guilty of numerous offenses related to a 2018 robbery of a Smashburger restaurant in Milford.[1]

[1] The defendant was found guilty of robbery in the first degree with a deadly weapon in violation of General Statutes § 53a-134 (a) (2), conspiracy to commit robbery in the first degree with a deadly weapon in violation of General Statutes § 53a-48 and § 53a-134 (a) (2), criminal possession of a firearm in violation of General Statutes (Rev. to 2017) § 53a-217 (a), carrying a pistol without a permit in violation of General Statutes (Rev. to 2017) § 29-35 (a), four counts of unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a), and conspiracy to commit larceny in the fourth degree in violation of § 53a-48 and General Statutes § 53a-125.

The defendant listed on his appeal form the docket number corresponding to the judgment pertaining to the finding that he violated his probation, in

352 Conn. 500 JULY, 2025 503

State *v.* McLaurin

On appeal to the Appellate Court, the defendant claimed that the trial court had deprived him of his right to due process under the federal constitution by denying his motion to suppress a one-on-one showup identification of him by a restaurant employee. See *State* v. *McLaurin*, 216 Conn. App. 449, 466, 285 A.3d 104 (2022). The Appellate Court affirmed the trial court's judgment of conviction, concluding that the exigencies of the investigation justified the police's use of the showup identification procedure and, therefore, that the identification was not unnecessarily suggestive. See id., 466, 470, 479. We granted the defendant's petition for certification to appeal, limited to the issue of whether the Appellate Court properly upheld the trial court's denial of his motion to suppress.[2] See *State* v. *McLaurin*, 346 Conn. 903, 287 A.3d 136 (2023). We affirm the judgment of the Appellate Court and conclude that the defendant's constitutional right to due process was not violated because, even if the identification procedure was unnecessarily suggestive, the identification was reliable.

The Appellate Court's opinion sets forth a more detailed recitation of the facts and procedural history. See *State* v. *McLaurin*, supra, 216 Conn. App. 451–65. We provide a summary herein, as supplemented by the record and the trial court's articulation. One evening in January, 2018, at approximately 8:30 p.m., the defendant and Royshon Ferguson entered the Smashburger res-

addition to the docket number pertaining to his conviction of the foregoing offenses, but he has failed to brief any claim relating to that judgment. We therefore consider any claim concerning that judgment to be abandoned. See, e.g., *Harris* v. *Bradley Memorial Hospital & Health Center, Inc.*, 306 Conn. 304, 319, 50 A.3d 841 (2012) ("[a]n appellant who fails to brief a claim abandons it" (emphasis omitted; internal quotation marks omitted)), cert. denied, 569 U.S. 918, 133 S. Ct. 1809, 185 L. Ed. 2d 812 (2013).

[2] After a panel of this court heard the initial oral argument, we ordered the trial court to issue an articulation, which the trial court did on November 25, 2024. We also ordered the parties to appear for reargument on January 29, 2025.

State *v.* McLaurin

taurant. They were wearing ski masks, but their eyes, mouths, and the skin around their eyes and mouths were visible. The defendant carried a semiautomatic gun. Three employees were working at the restaurant that night. Two of the employees, Jada Brinkley and Jamal McNeil, were working in the front of the restaurant. One employee, Casey Deloma, was working in the back room, where a small safe was located. When Ferguson and the defendant entered the restaurant, four customers were dining in the front of the restaurant. Two of the customers attempted to flee, but the defendant pointed the gun at them and told them, "don't run." He then directed Brinkley, McNeil, and all of the customers to the back room of the restaurant at gunpoint.

In the back room, the defendant handed the gun to Ferguson, who pointed it at Deloma and demanded that she unlock the safe. Deloma made two unsuccessful attempts to unlock the safe. After the second attempt, Ferguson said, "I'm going to give you ten seconds, or I'm going to shoot you." Deloma then attempted to unlock the safe a third time and was able to successfully open it. Ferguson took the money out of the safe and put it in his pockets. While this was happening, the defendant was standing next to Brinkley in the back room.

After stealing the money from the back room safe, Ferguson took Deloma to the front of the restaurant at gunpoint and demanded that she open the cash registers. She opened one register, and Ferguson stole the money inside of it. The defendant remained in the back room of the restaurant and demanded that Brinkley, McNeil and the customers give him their cell phones.

As Deloma was opening the second register, one of the customers, Garfield Stewart, who was lawfully carrying a concealed firearm, drew his gun on the defen-

State *v.* McLaurin

dant. The defendant immediately ran to the front of the restaurant and out the front door, leaving Ferguson behind. Stewart, who had followed the defendant to the front of the restaurant, then pointed his gun at Ferguson. Stewart began "bang[ing]" Ferguson's hand until Ferguson released the gun he was holding. Ferguson then ran out of the restaurant, exiting within seconds of the defendant.

At approximately 8:40 p.m., the Milford Police Department received a call informing it that an armed robbery was in progress at the Smashburger restaurant. Officer Matthew Joy was dispatched to the scene and arrived approximately three minutes after the call, at approximately 8:43 p.m. Immediately after arriving at the restaurant, he located a gun on the floor, behind the front counter. After speaking with the employees and customers, he learned that two suspects had fled the restaurant on foot and that they had turned right after they exited through the front door. Officer Joy interviewed Brinkley, who told him that the suspects were two Black males. One suspect, later identified as Ferguson, was described as "a Black male, about five feet, six inches, heavyset, wearing jeans and a dark-colored . . . hooded sweatshirt . . . ." The other suspect, later identified as the defendant, was described as "a Black male, approximately six feet, six foot one, [with] a thinner build, wearing jeans [and] a red, hooded sweatshirt with a dark-colored topcoat layer." The eyewitnesses told Officer Joy that the suspects were wearing dark-colored ski masks, one black and one green.

Officer Joy promptly relayed a description of the suspects to his fellow officers. Shortly thereafter, a passing motorist flagged down police officers in the vicinity and reported that he had just seen two Black males run into a wooded area, behind a car dealership and a storage facility, which were located approximately 800 feet across the street from the Smashburger

State *v.* McLaurin

restaurant. Responding officers eventually located Ferguson in the woods. When they found him, he had an eight to nine inch kitchen knife and $868 on his person.

At 8:50 p.m., Officer Joy, who had remained on scene at the restaurant, received a radio transmission informing him that other officers had apprehended a suspect. Sergeant Christopher Dunn, Officer Joy's commanding officer, instructed him to conduct a showup identification procedure with one of the eyewitnesses. Officer Joy selected Brinkley because she was the employee closest to the front of the restaurant when the suspects entered the restaurant, she was the first employee to encounter the suspects, she was able to give a description of the suspects, and she had been standing next to the defendant in the back room for a period of time. Prior to conducting the showup procedure, Officer Joy read the instructions for the showup to Brinkley. At no point did Officer Joy communicate to Brinkley that the police had one of the men responsible for the robbery in custody. Officer Joy drove Brinkley from the restaurant to the rear parking lot of the nearby car dealership in his cruiser, which took approximately one minute. The parking lot was well lit. At approximately 9:12 p.m., Brinkley positively identified Ferguson. Meanwhile, other officers continued to search for the second suspect.

About thirty minutes later, at 9:42 p.m., Officer Joy learned that other officers had detained a second suspect at the car dealership's parking lot. Officer Joy brought Brinkley back to the parking lot to conduct a second showup identification procedure. Once there, Officer Joy proceeded to the same location where Brinkley previously had identified Ferguson. Brinkley was seated in the rear of the driver's seat and viewed the defendant out of the open window. The area remained well lit. The defendant was seated in the back of an ambulance, approximately two to three car lengths from Officer Joy's cruiser. Officer Joy did not recall whether the

State *v.* McLaurin

defendant was handcuffed at the time or whether there were officers standing near the defendant. At approximately 9:56 p.m., Brinkley identified the defendant as the second suspect; she did not hesitate in making the identification.

Prior to trial, the defendant filed a motion to suppress the identification evidence of him on the grounds that it was improper, unreliable, and unnecessarily suggestive. At the hearing on the motion to suppress, the state presented testimony from Officer Joy and Brinkley. Officer Joy testified that exigent circumstances necessitating a showup identification of the defendant existed. Specifically, he testified that an armed robbery had just occurred and that the suspects had left the scene of the crime on foot. After one suspect was detained, there was concern that the other suspect could still have other weapons on his person. Officer Joy explained that, during the course of the investigation, he learned that Ferguson had been apprehended with a knife and that he did not know how many weapons were involved in the incident. Officer Joy further testified that it was important to eliminate the defendant as a suspect in the event that the perpetrator remained in the community.

At the suppression hearing, Brinkley testified that she did not have any memory of the event or the night in question because she had recently been in a major car accident and smokes marijuana. Brinkley testified that she "[m]ost likely" smoked "weed" on the day of the robbery but ultimately stated that she did not know if she had done so.

The state also presented four clips of footage from the body camera (body cam) worn by Officer Joy on the night of the incident, Brinkley's written statement from the night of the incident, and other exhibits. In the body cam footage, Brinkley identified Ferguson and the defendant, and discussed the suspects' physical fea-

State *v.* McLaurin

tures and clothing. At the hearing, Brinkley confirmed that it was her voice and image in the body cam footage, but she maintained that she had no recollection or memory of the night of the robbery.

In her written statement, Brinkley described the appearance of the robbers and detailed their actions during the robbery. See footnote 4 of this opinion. During the hearing, Brinkley confirmed that she wrote and signed the statement but said that she had no recollection of writing the statement or the contents of the statement. Brinkley also confirmed that she had signed and dated the document containing the eyewitness instructions for identification procedures, which Officer Joy testified that he had read to Brinkley prior to her identification of the defendant, but said that she did not remember them either.

The trial court denied the defendant's motion to suppress, concluding that "the identification, given all the facts and circumstances, was not unduly suggestive."[3]

At trial, Brinkley testified that she had recently been involved in an automobile accident and had no memory of the night of the incident because of that accident and her frequent marijuana use. On cross-examination, Brinkley further testified that she "most likely" smoked "weed" on the day of the robbery because she "get[s] high almost every day . . . ." She stated, "I don't remember too much . . . ." Detective Sergeant

_____

[3] "Prior to filing his brief in the [Appellate Court], the defendant filed a motion for articulation pursuant to Practice Book [2021] § 66-5. The defendant presented several questions for articulation, including, '[w]hat subordinate findings, if any, did the trial court make to support its determination that Brinkley's identification "was not unduly suggestive?" ' The state did not oppose this particular request for articulation. The court denied the defendant's motion for articulation. [The Appellate Court] granted the defendant's motion for review of the denial of his motion for articulation but denied the relief requested therein." *State* v. *McLaurin*, supra, 216 Conn. App. 462 n.9. Nevertheless, as we explain herein, this court, sua sponte, ordered the trial court to issue an articulation in this case.

State *v.* McLaurin

Michael Cruz testified that he spoke with Brinkley on the night of the robbery and that Brinkley did not appear to be under the influence of any drugs that evening. Detective Sergeant Cruz also testified that he did not have any concern about Brinkley's participation in the showup identification procedure that night.

Based on Brinkley's testimony, the trial court admitted into evidence, pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), her signed written statement that she had given to the police on the night of the robbery. After the court admitted the statement, Brinkley read the statement into the record.[4] The prosecutor also introduced into evidence the four video clips that were recorded on Officer Joy's body cam. In the first two clips, Brinkley can be heard identifying Ferguson. In the third clip, Brinkley can be seen and heard discussing the color of the mask worn by the "skinny"

---

[4] Brinkley's recitation of her statement was as follows: "On this day, January 19, 2018, at approximately 8:30 [p.m.], I was cleaning tables in the restaurant. As I was getting ready to walk in the back to grab a rag, I saw the door swing open, and then came two Black men, [one was] heavyset . . . with a dark blue hoodie, dark skin . . . and a mask; the other male was skinny, lighter skin, with a dark green mask, red camouflage coat on. I saw the gun in the skinny one's hand, and I immediately went to the back to let my coworkers know what was behind me. I showed him where the safe was. He grabbed my arm [and] walked me . . . [Deloma], [and McNeil] further to the back, where the safe was located. Then he pulled out the gun again and demanded someone to open the safe. [There] was silence. He started pointing the gun at everyone. [Deloma] asked, do you want me to open it and went to put the code in. She put it in a couple of times, but [the safe] didn't open. The heavy male then said she had ten seconds to open it or he was going to shoot her. She put the code in again, and the safe opened. He grabbed the drawer and started taking the money. Then, along came the skinny individual, with the four customers. The heavyset male took [Deloma] back to the front to empty out the registers. Meanwhile, [as] the skinny one was taking more money, he noticed one of the customers moving, and, before you know it, the customer pulled out his gun and started to chase the robber. [McNeil] told me to call the police. I stayed in the back until [McNeil] came there again, [and] I [knew that] it was clear [and] that the robbers were gone."

State *v.* McLaurin

perpetrator. In the fourth clip, Brinkley can be heard identifying the defendant. When asked if she recognized the suspect's clothing, she stated: "Yep . . . I see. Can you put the light on his jeans?" Once the perpetrator stood up, Brinkley can be heard saying: "Yep, that's him." When asked how sure she was, she can be heard saying: "Yup, I'm sure."

The jury found the defendant guilty of all counts, except for larceny in the fourth degree. See footnote 1 of this opinion. The trial court sentenced the defendant to twenty-five years of incarceration, execution suspended after eighteen years, and five years of probation.

Before the Appellate Court, the defendant claimed that the trial court should have granted his motion to suppress Brinkley's identification because the showup procedure utilized by the police was unnecessarily suggestive, and, as a result, the identification was unreliable. *State* v. *McLaurin*, supra, 216 Conn. App. 466. "After setting forth his general contention that showup identifications are 'widely condemned' because they are inherently and significantly suggestive"; id., 468; and arguing that the exigency " 'exception' " permitting their use was intended to be a narrow one; id.; the defendant claimed that the procedure by which Brinkley had identified him was unnecessarily suggestive for three reasons: (1) the police officers involved admitted at the suppression hearing that they did not need to use a showup identification procedure, (2) approximately ninety minutes elapsed between the crime and when Brinkley identified him, which, according to the defendant, belied the state's claim of exigency, and (3) the showup procedure was "conducted . . . in a suggestive place and staged . . . in a suggestive manner." (Internal quotation marks omitted.) Id., 468–69.

The Appellate Court disagreed with each contention and, like the trial court, concluded that the showup

State *v.* McLaurin

identification procedure was not unnecessarily sugges-
tive. See id., 470. Consequently, the Appellate Court had
no occasion to address whether the identification was
otherwise reliable. See id., 479 n.23. Ultimately, the
Appellate Court affirmed the judgment of the trial court.
Id., 479.

The defendant filed a petition for certification to
appeal, which we granted, limited to the following issue:
"Did the Appellate Court properly uphold the trial
court's denial of the defendant's motion to suppress the
one-on-one showup identification of the defendant?"
*State* v. *McLaurin*, supra, 346 Conn. 903.

On appeal to this court, the defendant asserts that
the Appellate Court incorrectly concluded that the chal-
lenged showup identification procedure was not unnec-
essarily suggestive. The defendant also urges this court
to overrule its precedent holding that, on the heels of
an armed robbery (or commission of another dangerous
felony), a pretrial showup procedure in close temporal
and geographic proximity to the crime is not unneces-
sarily suggestive in light of the exigencies of the criminal
investigation. See, e.g., *State* v. *Revels*, 313 Conn. 762,
773–74, 99 A.3d 1130 (2014) (showup identification pro-
cedure was not unnecessarily suggestive when police
reasonably believed that perpetrator "was likely . . .
on the run, in the area, and armed," and "[s]afeguarding
the public from a possibly armed and dangerous fugitive
was an immediate and pressing need"), cert. denied,
574 U.S. 1177, 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015).
The defendant asserts that this court's precedents
improperly equate exigency with convenience, and he
urges us to adopt a more stringent standard for the
admission of showup identification evidence. The defen-
dant argues that, since *Stovall* v. *Denno*, 388 U.S. 293,
87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967), courts improp-
erly have expanded the notion of what constitutes an
exigency to include "a myriad" of situations that, in his

State *v.* McLaurin

view, are not exigent. In order to effectuate the demands of the fourteenth amendment to the federal constitution, he contends, this court should adopt a "prophylactic" exclusionary rule limiting the use of showup identification procedures to "true exigencies . . . ." Under his proposed rule, showup identifications would be admissible only when (1) as in *Stovall* v. *Denno*, supra, 302, a showup procedure is " 'the only feasible procedure' " in light of a gravely injured witness, (2) the police lack probable cause to detain a suspect, or (3) the police are in pursuit of "an armed suspect who has harmed, or tried to harm," a member of the public. Adopting such a rule, the defendant argues, will not prevent the police from conducting showup procedures in other situations, but it will simply preclude the state from using those identifications in court.

The state contends that the Appellate Court properly affirmed the judgment of the trial court, concluding that the showup identification procedure was not unnecessarily suggestive and, therefore, does not violate the due process clause of the fourteenth amendment to the United States constitution. In the alternative, the state asserts that the challenged identification was reliable. The state further asserts that we should not adopt the prophylactic rule urged by the defendant. Specifically, the state contends that there is no merit to the defendant's claim that courts disdain showup identifications, as courts uniformly have approved the use of showup identifications in appropriate circumstances, and, indeed, "each of the jurisdictions relied [on] by the defendant to support his claim of universal disdain [for showup identifications has], like Connecticut, approved of [their use] under facts analogous to this case . . . ." The state further contends that "[n]othing in the [United States] Supreme Court precedent supports the defendant's contention that there must be a clear lack of probable cause [to make an arrest], a gravely injured witness, or armed

State *v.* McLaurin

suspects who have tried to harm someone before a showup'' procedure may be conducted. Relying on *Simmons* v. *United States*, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968), in which the court was ''unwilling to prohibit [the use of an allegedly unnecessarily suggestive identification procedure], either in the exercise of [its] supervisory power or, still less, as a matter of constitutional requirement''; id., 384; the state argues that ''the [United States] Supreme Court has long recognized that the use of a suggestive identification procedure may be necessary and, thus, comport with due process, when officers are searching for fleeing suspects shortly after a crime and need to quickly determine if they are on the right track or need to keep searching.''

On November 15, 2023, a panel of this court consisting of then Chief Justice Robinson and Justices McDonald, D'Auria, Mullins, Ecker, Alexander and Dannehy heard the first oral argument in this matter. On September 17, 2024, this court notified the parties that retired Chief Justice Robinson and Justice Alexander would be replaced by Judges Clark and Westbrook and ordered the parties to appear for a rehearing. Before that hearing took place, pursuant to Practice Book § 60-5, we, sua sponte, ordered the trial court to articulate the following: (1) ''What subordinate findings did the trial court make to support its determination that Brinkley's identification 'was not unduly suggestive?' In particular, what portions of Officer Joy's and . . . Brinkley's testimony did the court credit and what portions, if any, did the court reject? The court should also articulate any other findings of fact necessary to support its determination.'' (2) ''Assuming the identification was unduly or impermissibly suggestive, articulate whether, under the totality of the circumstances, the identification was still reliable and the facts that support such a conclusion.'' And (3) ''[a]rticulate the factual basis that supports the conclusion that an exigency existed under the circumstances

State *v.* McLaurin

of this case that justified the showup identification.”
The trial court issued its articulation on November 25,
2024. Thereafter, on January 29, 2025, this court heard
a second argument with the newly constituted panel.
Additional facts will be set forth as necessary.

I

Whether a pretrial identification procedure violates
a defendant's right to due process is a mixed question
of law and fact subject to this court's plenary review.
See, e.g., *State* v. *Marquez*, 291 Conn. 122, 136–37, 967
A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175
L. Ed. 2d 163 (2009). Because the suggestiveness and
reliability of an identification procedure implicate a
defendant's constitutional right to due process, we must
examine the record scrupulously to determine whether
the facts found by the trial court are supported by
substantial evidence. See, e.g., id., 137. Nonetheless,
“we will not disturb the findings of the trial court as
to subordinate facts unless the record reveals clear and
manifest error.” (Internal quotation marks omitted.)
*State* v. *St. John*, 282 Conn. 260, 277, 919 A.2d 452 (2007).

“The test for determining whether the state's use of
an [allegedly] unnecessarily suggestive identification
procedure violates a defendant's federal due process
rights derives from the decisions of the United States
Supreme Court in *Neil* v. *Biggers*, 409 U.S. 188, 196–97,
93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), and *Manson* v.
*Brathwaite*, 432 U.S. 98, 113–14, 97 S. Ct. 2243, 53 L.
Ed. 2d 140 (1977). As the court explained in *Brathwaite*,
fundamental fairness is the standard underlying due
process, and, consequently, ‘reliability is the linchpin
in determining the admissibility of identification testi-
mony . . . .’ Id., 114. Thus, ‘the required inquiry is made
on an ad hoc basis and is two-pronged: first, it must be
determined whether the identification procedure was
unnecessarily suggestive; and second, if it is found to

State *v.* McLaurin

have been so, it must be determined whether the identification was nevertheless reliable based on [an] examination of the totality of the circumstances.' . . . *State* v. *Marquez*, [supra, 291 Conn. 141].'' *State* v. *Harris*, 330 Conn. 91, 101, 191 A.3d 119 (2018).

"With respect to the first prong of this analysis, [b]ecause, [g]enerally, [t]he exclusion of evidence from the jury is . . . a drastic sanction, [it] . . . is limited to identification testimony [that] is manifestly suspect . . . . [Consequently] [a]n identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification. . . . We have recognized that [ordinarily] a one-to-one confrontation between a [witness] and the suspect presented . . . for identification is inherently and significantly suggestive because it conveys the message to the [witness] that the police believe the suspect is guilty.'' (Internal quotation marks omitted.) *State* v. *Ruiz*, 337 Conn. 612, 622, 254 A.3d 905 (2020), quoting *State* v. *Revels*, supra, 313 Conn. 772–73; see also, e.g., *Neil* v. *Biggers*, supra, 409 U.S. 198 ("[s]uggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous"). For this reason, when not necessary, "the presentation of a single suspect to a witness by the police (as opposed to a lineup, in which several individuals are presented [by] the police, only one of whom is the suspect) . . . has . . . been widely condemned . . . .'' (Citations omitted; internal quotation marks omitted.) *Brisco* v. *Ercole*, 565 F.3d 80, 88 (2d Cir.), cert. denied, 558 U.S. 1063, 130 S. Ct. 739, 175 L. Ed. 2d 542 (2009).

It is well established, however, that the use of a one-on-one showup identification procedure does not invariably constitute a denial of due process, as it may be justified by exigent circumstances. See, e.g., *State* v.

State *v.* McLaurin

*Revels*, supra, 313 Conn. 773–74; *State* v. *Wooten*, 227 Conn. 677, 686, 631 A.2d 271 (1993). Thus, a showup identification procedure conducted in close temporal and geographic proximity to the offense may be deemed reasonable and, therefore, permissible for federal due process purposes when "it was prudent for the police to provide the victim with the opportunity to identify [his or] her assailant while [his or] her memory of the incident was still fresh . . . and . . . [the procedure] was necessary to allow the police to eliminate quickly any innocent parties so as to continue the investigation with a minimum of delay, if the victim excluded the defendant as a suspect or was unable to identify him." (Citation omitted; internal quotation marks omitted.) *State* v. *Wooten*, supra, 686; accord *State* v. *Ledbetter*, 275 Conn. 534, 551, 881 A.2d 290 (2005) (overruled in part on other grounds by *State* v. *Harris*, 330 Conn. 91, 191 A.3d 119 (2018)), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

Moreover, when the police take prompt steps to identify a detained suspect in order to achieve these objectives, the use of handcuffs and illumination does not necessarily render the identification unduly suggestive. See, e.g., *United States* v. *Bautista*, 23 F.3d 726, 730 (2d Cir.) ("The fact that the suspects were handcuffed, in the custody of law enforcement officers, and illuminated by flashlights . . . did not render the [pretrial] identification procedure unnecessarily suggestive. . . . Because the on-the-scene identification was necessary to allow the officers to release the innocent, the incidents of that identification were also necessary."), cert. denied sub nom. *Minier-Contreras* v. *United States*, 513 U.S. 862, 115 S. Ct. 174, 130 L. Ed. 2d 110 (1994); see also, e.g., *State* v. *Revels*, supra, 313 Conn. 767, 774 (showup identification procedure was not unnecessarily suggestive, even though identification took place while "the defendant was standing in the middle of the

State *v.* McLaurin

road, handcuffed and surrounded by uniformed police officers . . . [one of whom] directed [a] spotlight on his cruiser toward the [defendant]'').

## II

The defendant claims that his right to due process was violated because the showup identification procedure used in the present case was unnecessarily suggestive. We acknowledge that the showup procedure in the present case was suggestive. Indeed, this court has frequently acknowledged that showup identification procedures are ''inherently and significantly suggestive . . . . We also have recognized, however, that the existence of exigencies may preclude such a procedure from being *unnecessarily* suggestive.'' (Emphasis in the original; internal quotation marks omitted.) *State* v. *Revels*, supra, 313 Conn. 772–73. We need not determine whether the showup procedure was unnecessarily or unduly suggestive in the present case, however, because, even if we assume, arguendo, that it was, the trial court correctly concluded that Brinkley's identification of the defendant was reliable under all of the relevant circumstances.[5] See, e.g., *State* v. *Ruiz*, supra, 337 Conn. 624 (''[w]e need not opine on the propriety of the procedure used by the police . . . because, even if we were to assume . . . that it was unnecessarily suggestive, [the] identification of the defendant was reliable under all of the relevant circumstances''); see also, e.g., *Van Pilon* v. *Reed*, 799 F.2d 1332, 1339 (9th Cir. 1986) (court may assume suggestiveness arguendo and review reliabil-

[5] Because we assume, without deciding, that the showup identification procedure was unnecessarily suggestive but conclude that the identification was nevertheless reliable under the totality of the circumstances, we do not address the defendant's contention that we should adopt a prophylactic rule, under the federal due process clause, barring the admission of identifications obtained through a showup procedure unless the police conducted the showup procedure to accommodate a gravely injured witness, there was a lack of probable cause to arrest a suspect, or an armed suspect had harmed (or attempted to harm) a member of the public.

State *v.* McLaurin

ity); *Bonderer* v. *Jones*, Docket No. 2:20-cv-0415 DAD AC, 2024 WL 4453461, *6 (E.D. Cal. October 9, 2024) (court did not need to determine whether single photograph identification procedure was unduly suggestive because, assuming it was, identification itself was nevertheless reliable under totality of circumstances).

The following additional facts are necessary for our resolution of this issue. In its articulation, the trial court explained that, "[a]ssuming [this] court finds [that] the [showup] identification was unduly or impermissibly suggestive, the [trial] court articulates how, under the totality of the circumstances, the identification was still reliable.

"The identification was conducted in close temporal and geographical proximity to the alleged offense: an armed robbery in progress call was received by the police at 8:40 p.m., and . . . Brinkley was brought to the [car] dealership to conduct an identification at 8:50 p.m.; she identified . . . Ferguson at 9:12 p.m.; she was returned to the dealership at 9:42 p.m. for a second identification, and she identified the defendant at 9:56 p.m. . . . The restaurant was described as being across the street from the dealership, about [one] tenth of a mile away . . . . The police provided . . . Brinkley an opportunity to identify the defendant while her memory was still fresh. . . . Brinkley identified both suspects quickly and without hesitation. Officer Joy testified [that] a firearm was found on the floor of the restaurant, behind the front counter . . . . The court recalls in . . . Brinkley's statement that the skinnier suspect (identified as the defendant) was in possession of a gun at the time of the robbery . . . . Officer Joy also testified that . . . Ferguson was found with a knife on his person when he was apprehended. Officer Joy also stated [that] he did not know how many weapons were involved in this incident . . . ." (Citations omitted.)

State *v.* McLaurin

Furthermore, the trial court explained in its articulation that it "credited all of the testimony of Officer Joy and . . . Brinkley and did not reject any of it. The court noted the issues . . . Brinkley herself raised regarding her lack of present memory, frequent marijuana use, and the possibility [that] she was not wearing glasses on the night of the incident."

This court has explained that, to determine whether an identification from an unnecessarily suggestive procedure is reliable for federal constitutional purposes, we look at the totality of the circumstances. See, e.g., *State* v. *Ruiz*, supra, 337 Conn. 624. To assist us, we examine the following factors (known as the *Biggers* factors): " '[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of his [or her] prior description of the criminal, [4] the level of certainty demonstrated at the [identification], and [5] the time between the crime and the [identification]. *Manson* v. *Brathwaite*, supra, [432 U.S.] 114, citing *Neil* v. *Biggers*, supra, [409 U.S.] 199–200.' . . . *State* v. *Harris*, supra, 330 Conn. 108." *State* v. *Ruiz*, supra, 624–25.

We use these factors to guide our scrupulous review of the record to determine whether substantial evidence in the record supports the trial court's finding that Brinkley's identification of the defendant was reliable. We conclude that the relevant factors in the present case support the conclusion that the challenged identification was reliable.

First, we consider the opportunity of the witness to view the criminal at the time of the crime. The evidence established that Brinkley was in the front of the restaurant when Ferguson and the defendant entered, and that she then went into the back of the restaurant with them and stood next to the defendant while Ferguson ordered Deloma to open the safe. In addition, in its

State *v.* McLaurin

articulation, the trial court explained that Officer Joy testified that "[h]e [had] selected . . . Brinkley to participate in the identification because she was the employee closest to the front of the [restaurant, who] encountered the suspects first . . . ." (Citation omitted.) On the basis of this evidence, we conclude that the first factor weighs in favor of reliability.

Turning to the second factor, the witness' degree of attention, we conclude that this factor also weighs in favor of reliability. The evidence demonstrates that Brinkley was able to provide a detailed description of the perpetrators, which matched the appearance of Ferguson and the defendant on the night in question, and that she communicated with Officer Joy during his investigation. In its articulation, the trial court explained that "Officer Joy testified that he [had] interviewed . . . Brinkley prior to the identification. She told him there were two Black male suspects, one short and heavyset, the other tall and thinner. She stated [that] they were wearing masks when they entered the restaurant." Indeed, Brinkley's statement to the police contains a detailed description of the events of that night. See footnote 4 of this opinion.

We acknowledge that, during trial, Brinkley testified that she had an automobile accident prior to trial that impacted her memory of the robbery. Also, during cross-examination, Brinkley testified that she "most likely" was smoking marijuana on the night in question and was not sure whether she was wearing her eyeglasses. In its articulation, the trial court explicitly took into account Brinkley's testimony in this regard, but it relied on her "written statement, made contemporaneous[ly] [with] the events in question," and her detailed descriptions therein.

We next examine the accuracy of the witness' prior description of the defendant. In this case, Officer Joy

State *v.* McLaurin

testified that he had interviewed Brinkley and the other eyewitnesses before the identification. Brinkley had provided Officer Joy with a description of the suspects, one of which matched the general appearance of the defendant. Specifically, Brinkley had described one of the suspects as a skinny Black male, who wore a dark green mask and a red camouflage coat. See footnote 4 of this opinion. Brinkley's identification was consistent with how the defendant appeared when he was located on the night of the robbery. Furthermore, in its articulation, the trial court explained that "Officer Joy testified [that] a firearm was found on the floor of the restaurant, behind the front counter . . . . The [trial] court recalls in . . . Brinkley's statement that the skinnier suspect (identified as the defendant) was in possession of a gun at the time of the robbery . . . ." (Citations omitted.) Accordingly, we conclude that the accuracy of Brinkley's identification of the perpetrators of the crime weighs in favor of the reliability of the identification.

The next factor to consider is the level of certainty demonstrated by Brinkley with respect to the identification. Officer Joy testified that Brinkley had identified the defendant without any hesitation, and Officer Joy recorded that identification in writing. Moreover, the video clips from Officer Joy's body cam demonstrate that Brinkley had identified the defendant with certainty on the night of the robbery. In its articulation, the trial court explained that the prosecutor introduced video from Officer Joy's body cam and asked Brinkley to identify her voice in the video. She did so, and the following statements were attributed to her: " 'Yup, that's him'; '[c]an you put a light on his face because he had on a mask?' And 'I saw your big ass, I saw you . . . yup, that's you.' " In addition, in the video, when Officer Joy asked Brinkley whether she took a good look at the individuals who robbed the restaurant, she answered in the affirmative. When asked, in the video, if she

State *v.* McLaurin

recognized the clothing, Brinkley responded, "yes." Furthermore, in the body cam video, when Officer Joy asked Brinkley whether she was sure that the defendant was one of the robbers, Brinkley responded, "I'm sure." (Internal quotation marks omitted.) Brinkley's statements in the body cam footage reveal that, at the time she identified the defendant, she did so with great certainty. Accordingly, we conclude that this factor weighs in favor of the reliability of Brinkley's identification of the defendant.

The final factor to consider is the time between the crime and the identification. The evidence established that the Milford Police Department received a call at 8:40 p.m., informing it that an armed robbery was in progress. Brinkley identified the defendant a little more than one hour later, at approximately 9:56 p.m. Therefore, we conclude that the time between the crime and the identification was quite short and that this factor weighs in favor of reliability. See, e.g., *Morris* v. *Carey*, 438 Fed. Appx. 634, 636 (9th Cir.) (field showup did not violate due process when it "was held just one hour after the crime" and when "the witnesses spent time with [the] [p]etitioner during [the] crime in very close quarters . . . [and] had ample time to observe the uncovered portions of [the] petitioner's face and his clothing"), cert. denied, 565 U.S. 1041, 132 S. Ct. 589, 181 L. Ed. 2d 433 (2011).

Considering the totality of the circumstances, we conclude that Brinkley's identification of the defendant was reliable. Consequently, we agree with the Appellate Court that the trial court properly denied the defendant's motion to suppress Brinkley's identification because its use by the state did not violate the defendant's rights under the due process clause of the fourteenth amendment to the United States constitution. See *State* v. *McLaurin*, supra, 216 Conn. App. 451, 466.

State *v.* McLaurin

On appeal, the defendant asserts that the trial court's determination that the identification was reliable is undermined by a review of the factors that this court identified in *State* v. *Harris*, supra, 330 Conn. 118–19, 131, 133, as additional considerations for reliability under our state constitution. We are unpersuaded.

In *Harris*, this court identified the analytical framework required by our state constitution "for evaluating the reliability of an identification that is the result of an unnecessarily suggestive identification procedure." Id., 131. Relying on *State* v. *Henderson*, 208 N.J. 208, 288–89, 27 A.3d 872 (2011), this court, in *Harris*, explained that a court should consider how the reliability of an identification is affected by system variables, which are factors that are within the control of the criminal justice system, and estimator variables, which are factors that stem from conditions over which the criminal justice system has no control and typically arise out of the circumstances under which the eyewitness viewed the perpetrator during the commission of the crime. *State* v. *Harris*, supra, 330 Conn. 131; see also *State* v. *Guilbert*, 306 Conn. 218, 236 n.11, 49 A.3d 705 (2012).

Specifically, in *Harris*, this court held that a trial court should consider the following eight estimator variables identified in *State* v. *Guilbert*, supra, 306 Conn. 253–54: "(1) there is at best a weak correlation between a witness' confidence in his or her identification and the identification's accuracy; (2) the reliability of an identification can be diminished by a witness' focus on a weapon; (3) high stress at the time of observation may render a witness less able to retain an accurate perception and memory of the observed events; (4) cross-racial identifications are considerably less accurate than identifications involving the same race; (5) memory diminishes most rapidly in the hours immediately following an event and less dramatically in the

State *v.* McLaurin

days and weeks thereafter; (6) an identification may be less reliable in the absence of a double-blind, sequential identification procedure; (7) witnesses may develop unwarranted confidence in their identifications if they are privy to postevent or postidentification information about the event or the identification; and (8) the accuracy of an eyewitness identification may be undermined by unconscious transference, which occurs when a person seen in one context is confused with a person seen in another." (Internal quotation marks omitted.) *State* v. *Harris*, supra, 330 Conn. 118–19; see also id., 133.

Critically though, in *State* v. *Guilbert*, supra, 306 Conn. 218, we explained that, although the estimator variables "are widely accepted by scientists, they are largely unfamiliar to the average person, and, in fact, many of [those variables] are counterintuitive."[6] (Footnote omitted.) Id., 239. Because of the counterintuitive nature of estimator variables, we allow for the defendant to introduce expert testimony to help the fact finder evaluate the likelihood of misidentification. See id., 251–54.

Although we are skeptical that the defendant truly makes out a reviewable claim under the state constitution in the present case, the state has, in its brief, responded to the defendant's argument under the *Harris* factors. We thus address the dissent's state constitutional discussion and still conclude that the identification was reliable.[7] The defendant has not asked us to revisit the

[6] "For example, people often believe that the more confident an eyewitness is in an identification, the more likely the identification is to be accurate. Similarly, the average person is likely to believe that eyewitnesses held at gunpoint or otherwise placed in fear are likely to have been acutely observant and therefore more accurate in their identifications. . . . Yet none of these beliefs is true." *State* v. *Guilbert*, supra, 306 Conn. 240–41. But laypersons are unaware of the effect of the factors on the reliability of a witness' testimony in this regard.

[7] In his motion to suppress, the defendant claimed that the identification violated his rights under both the state and federal constitutions. Nevertheless, the defendant did not ask the trial court to make findings under *State* v. *Harris*, supra, 330 Conn. 131, with respect to any estimator variables or

352 Conn. 500 JULY, 2025 525

State *v.* McLaurin

*Harris* factors or to adopt any additional factors to guide our review. Therefore, we do not.

It is important to note that, although *Harris* specifically allows for the defendant to introduce expert testimony on estimator variables, and these factors require the presentation of scientific evidence because they are unknown to the average fact finder, the defendant did not introduce any expert testimony. Despite his failure to introduce expert testimony on the *Harris* factors during the trial court proceedings, the defendant, on appeal, points to the following estimator variables as undermining the trial court's finding of reliability: "The decoupling of confidence and accuracy is one of 'eight

to introduce any expert testimony on the estimator variables or their import in this case. Indeed, in *Harris*, we explained that, for state constitutional purposes, "to obtain a pretrial hearing, the defendant has the initial burden of offering some evidence that a system variable undermined the reliability of the eyewitness identification. . . . If the defendant meets this burden, the state must then offer evidence demonstrating that the identification was reliable in light of all relevant system and estimator variables. . . . If the state adduces such evidence, the defendant must then prove a very substantial likelihood of misidentification. . . . If the defendant meets that burden of proof, the identification must be suppressed." (Citations omitted.) Id.; see also, e.g., S*tate* v. *Perez-Lopez*, 218 Conn. App. 555, 562, 582–83, 293 A.3d 1 (agreeing with defendant that it was error for trial court not to apply burden shifting framework adopted in *Harris* in connection with his state constitutional due process claim that identification was not reliable but concluding that error was harmless), cert. denied, 348 Conn. 902, 301 A.3d 529 (2023).

In the present case, the defendant did not seek to invoke the burden shifting framework under *Harris*, and it is questionable whether he even satisfied the first step of that framework, namely, showing that a system variable rendered the identification unreliable. To be sure, in *State* v. *Henderson*, supra, 208 N.J. 208, the case we relied on in *Harris* to adopt the system and estimator variables rubric; see *State* v. *Harris*, supra, 330 Conn. 131; the New Jersey Supreme Court noted that a showup identification procedure conducted *within* two hours of a crime is not a system variable sufficient to trigger a hearing because it does not undermine the reliability of an identification. See *State* v. *Henderson*, supra, 260–61 (noting study showing that "showups performed within minutes of an encounter were just as accurate as lineups" and that showups conducted more than two hours after event lead to decreased reliability).

State *v.* McLaurin

estimator variables' that govern reliability under the state constitution. . . . The other relevant factors are: the negative impact on reliability if the witness was 'focus[ed] on a weapon'; the inability to accurately perceive and remember events due to 'high stress at the time of observation'; and the absence of a double-blind, sequential identification procedure.'' (Citation omitted.) Specifically, the defendant asserts that ''Brinkley was probably high, petrified and focused on a gun, and did not identify the defendant during 'a double-blind, sequential identification procedure.' ''

We disagree. First, the evidence does not establish that Brinkley was ''high'' when she made the identification. Although Brinkley testified that she ''probably'' had smoked marijuana on the night in question, Brinkley also testified that she had no memory of the night of the incident. Moreover, Detective Sergeant Cruz, who interacted with Brinkley the night of the incident, testified that Brinkley did not appear to be ''high'' or under the influence of any drugs that night. So, at best, there is conflicting evidence. Second, although there was evidence presented at trial that Brinkley was scared, fear, in and of itself, does not render an identification unreliable. See, e.g., *State* v. *Wooten*, supra, 227 Conn. 681, 688 (victim's identification of defendant was reliable despite victim's observation of defendant during sexual assault in which he threatened her with ''sharp metal object''); *State* v. *Scott*, 191 Conn. App. 315, 339–40, 214 A.3d 871 (witness identification was reliable even though witness was in '' 'panic mode' '' during robbery in which witness was threatened with gun), cert. denied, 333 Conn. 917, 216 A.3d 651 (2019). Third, the evidence demonstrates that, although there was a weapon involved in the crime, most of the time that Brinkley was standing next to the defendant in the brightly lit back room, he did not have the gun. In fact, shortly after bringing Brinkley and the other individuals to the back room,

State *v.* McLaurin

the defendant handed the gun to Ferguson, who led Deloma to the front of the restaurant. Therefore, the evidence does not support the defendant's contention that Brinkley was so focused on the gun that her identification was unreliable. Finally, although Brinkley did not identify the defendant in a double-blind, sequential identification procedure, the showup procedure occurred within eighty-six minutes of the incident. Social science demonstrates that there is no greater likelihood for misidentification in a showup than in a lineup if the showup procedure took place less than two hours after the witness viewed the perpetrator. See A. Yarmey et al., "Accuracy of Eyewitness Identifications in Showups and Lineups," 20 Law & Hum. Behav. 459, 465, 468 (1996). But see *State* v. *Henderson*, supra, 208 N.J. 261 (showup identification procedures conducted more than two hours after event in question present heightened risk of misidentification).

The judgment of the Appellate Court is affirmed.

In this opinion D'AURIA, DANNEHY and CLARK, Js., concurred.

McDONALD, J., with whom ECKER and WESTBROOK, Js., join, dissenting. The preeminent American legal scholar on the law of evidence long ago recognized that showup[1] identifications are "next to worthless" and that "there is no excuse for jeopardizing the fate of innocent

[1] "A [showup] is an identification procedure in which the police present a single suspect to an eyewitness and then ask the eyewitness whether the suspect is the perpetrator. Typically, [showups] are conducted in the area of, and shortly after, the alleged crime. Often, when the eyewitness views the sole suspect, the suspect will be in police custody and may even be [handcuffed] or locked in a police squad car. [Showups] are very convenient for law enforcement as they allow for a quick and easy resolution of the investigation, without having to take the time to assemble a lineup or [photographic] array." (Footnotes omitted.) M. Cicchini & J. Easton, "Reforming the Law on Show-Up Identifications," 100 J. Crim. L. & Criminology 381, 388–89 (2010).

State *v.* McLaurin

men by such clumsy antiquated methods . . . ." (Citations omitted.) 4 J. Wigmore, Evidence (3d Ed. 1940) § 1130, p. 214 n.1. More than eight decades after Professor John Henry Wigmore first made this statement in his treatise—a treatise retired United States Supreme Court Justice Felix Frankfurter properly noted was "unrivaled as the greatest treatise on any single subject of the law"[2]—courts still regularly admit this highly unreliable evidence, despite an abundance of scholarship and science demonstrating that showup identifications are inherently suggestive, unnecessary, and inaccurate.

Today, this court considers whether such a highly suggestive and inherently unreliable showup identification was properly admitted into evidence at the trial of the defendant, Gregory E. McLaurin. The majority recognizes that the showup at issue was "suggestive." Part II of the majority opinion. Although the trial court and the Appellate Court determined that an exigency made the identification procedure not unnecessarily suggestive, the majority concludes that it does not need to determine whether the showup was unnecessarily suggestive because, even if it was, the identification was reliable. I write separately for two reasons. First, I analyze the exigent circumstances exception on which the police often rely to justify unnecessarily suggestive identification procedures, which the majority declines to address. Second, I disagree with the majority that the identification at issue in the present case was reliable.

Despite the Appellate Court's conclusion to the contrary, I cannot conclude that there was an exigency in the present case that required this unnecessarily suggestive identification procedure. See *State* v. *McLaurin,*

[2] F. Frankfurter, "John Henry Wigmore: A Centennial Tribute," 58 Nw. U. L. Rev. 443, 443 (1963). Justice Frankfurter continued: "I make no exception to this superlative statement. It is not only a great treatise on the law of evidence, but it is a masterpiece of scholarship, conveyed through a distinguished style of writing." Id.

State *v.* McLaurin

216 Conn. App. 449, 466, 470, 285 A.3d 104 (2022). Prior to the showup identification procedure, the police (1) already had two suspects in custody and had stopped searching for the perpetrators, (2) conceded they had probable cause to arrest the defendant without the showup identification, (3) had recovered the gun used in the robbery, and (4) knew that the identifying witness was not injured. Although it may well have been more convenient for the police to conduct a showup identification rather than to undertake the effort to formulate a more reliable photographic array or lineup identification; see General Statutes § 54-1p; mere convenience does not constitute an exigent circumstance in which the use of a showup is the only feasible identification procedure. If the situation at issue can be characterized as exigent, then I cannot imagine any situation in which the police would not be justified in conducting a showup identification shortly after a crime is committed. This supposition would almost completely undermine the legislature's goal in passing § 54-1p, which sets forth specific procedures for the state and municipal police to follow when conducting identifications. Our legislature passed § 54-1p, recognizing that eyewitness identifications are "prone on the one hand to stunning inaccuracy but at the same time [are] often the most compelling testimony in the courtroom." Conn. Joint Standing Hearings, Judiciary, Pt. 6, 2011 Sess., p. 1910, remarks of Senator Martin M. Looney. It is likely that the Appellate Court followed a line of cases from this court that have held that showups conducted under similar circumstances were not unnecessarily suggestive. These cases, which long predate the legislature's 2011 mandate for reliable identifications in § 54-1p, have incorrectly expanded the circumstances that may be characterized as "exigent." It is long past time that this court limit the admissibility of showup identifications to true exigencies, in which a showup is the only feasible identification proce-

State *v.* McLaurin

dure available to law enforcement. The majority's application of the factors set forth in *Neil* v. *Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), highlights the dangers with both the exigency exception and the reliability analysis under the federal constitution. I also disagree with the majority's conclusion that, under the factors set forth in *State* v. *Harris*, 330 Conn. 91, 118–19, 131, 133, 191 A.3d 119 (2018), the identification was reliable. Accordingly, I respectfully dissent.

The context in which the showup identification occurred is critical to evaluating whether the identification procedure employed by the police was unnecessarily suggestive. In 2018, two individuals robbed a restaurant on a busy commercial street in Milford. At approximately 8:30 p.m., two Black men entered the restaurant; one was short and heavyset, and the other was tall and thin. Both men wore ski masks, jeans and hooded sweatshirts. The masks left their "eyes, mouths, and the skin around [them] . . . visible." *State* v. *McLaurin*, supra, 216 Conn. App. 451. The tall individual also wore a dark-colored coat and was holding a handgun. When the men entered the restaurant, there were three employees working and four customers present. The men ordered the two employees who were working in the front of the restaurant and all of the customers into the back office at gunpoint. One of the employees, Jada Brinkley, "was so petrified . . . [that] she was screaming . . . 'oh my fucking God, I'm so fucking scared. We're going to die.' " The taller man handed the gun to the shorter one, who then pointed it at one of the employees and told her to unlock the safe. The employee complied, and the shorter man emptied the safe and stuffed the money in his pockets. The shorter man then led the employee to the front cash registers and ordered her to empty one of the cash registers. Around the same time, the tall man ordered the remaining individuals in the back office to turn over

State *v.* McLaurin

their cell phones. One of the customers, however, was armed, and, when he drew his weapon on the tall man, the tall man ran out of the restaurant. That customer then went to the cash register area and knocked the gun out of the shorter individual's hand. The shorter man then ran out of the restaurant as well.

A Milford police officer, Matthew Joy, arrived at the restaurant at approximately 8:43 p.m. The employees and customers described the two men to Joy and informed him that the two individuals fled on foot. Joy relayed this information to other officers over the police radio. Joy also located a gun on the floor, behind the front counter. As the Milford police began searching for the suspects, a passing motorist informed them that he saw two Black males run across the road and into a nearby vacant parking lot that bordered a wooded area. Officer Sean Owens and his police dog entered the woods behind the vacant parking lot, and the dog followed a scent to a path along the edge of the woods. Owens spotted an individual, approximately fifteen yards away, who matched the description of the shorter suspect. The man ignored Owens' command to "get [his] hands up" and to get "down on the ground," and the man, instead, reached for his waistband. Owens' police dog subdued the man by biting his leg. Owens and his dog subsequently left the area to search for the second suspect.

Officer Christopher Deida searched the suspect and found a kitchen knife and $868 in the front pockets of his sweatshirt. Deida asked the man several times, "where's the other guy you were with?" After initially claiming that he did not know what Deida was talking about, the man told Deida that "his friend 'jumped the fence' and pointed to a nearby chain-link fence with barbed wire that ran along the wooded area." *State* v. *McLaurin*, supra, 216 Conn. App. 454–55. The police then escorted the man to the nearby vacant parking

lot. The shift commander told Sergeant Christopher Dunn to "do the witness [identification]" in the parking lot. Dunn then instructed Joy to conduct an eyewitness showup identification in the parking lot. Joy chose to have Brinkley identify the suspect because she "had the best view of the suspects," and Joy thereafter drove Brinkley to the parking lot.

When they arrived at the parking lot, Joy read Brinkley a preprinted rules and instructions form for identification procedures. Specifically, he told Brinkley that "she was going to view some people. It may or may not be the person that she had seen during the incident but that it is important to clear innocent persons [of suspicion] as well, and . . . after making an identification, she shouldn't talk about the process to anyone." Joy then lowered the rear window of his patrol car, so that Brinkley could see the man whom the police had detained. Brinkley quickly identified the man as the shorter masked individual. The police later identified him as Royshon Ferguson. Joy then drove Brinkley back to the restaurant.

Meanwhile, Owens and his dog could not locate the second man after a twenty to thirty minute search. Eventually, Owens ended the search. As Owens walked toward his car, however, his dog alerted him to the presence of another individual. Owens saw an unmasked man, approximately fifty to sixty yards from where Ferguson was apprehended, who "was hunkered down in head-high thickets . . . ." Owens detained the man, and other officers brought him to the parking lot where the earlier identification had taken place.

At 9:42 p.m., Joy was instructed to bring Brinkley back to the parking lot for a showup identification of the second man. Joy drove Brinkley to the parking lot, read her the same instructions he had previously read her for the earlier identification, and lowered the rear

State *v.* McLaurin

window. Joy's car was about "two or three car lengths" from the man, who was unmasked and sitting in the back of an ambulance. At approximately 9:56 p.m., Brinkley identified the man as the taller masked robber. The police later identified the man as the defendant.

Prior to trial, the defendant moved to suppress Brinkley's showup identification "as the [fruit] . . . of improper, unreliable and unnecessarily suggestive police identification procedures . . . [that were] so highly and unnecessarily suggestive and conducive to the making of irreparable misidentifications . . . [that they] render[ed] any identification[s] procured thereby unconstitutionally unreliable . . . ." On the first day of trial, the trial court heard arguments and testimony on the defendant's motion. Joy testified that he did not remember whether, at the time of the identification, the defendant was handcuffed, whether his hands were in front of his body or behind his back, or whether any police officers were next to him. There was testimony, however, that it is Milford Police Department policy to keep an armed robbery suspect handcuffed after having detained him. Joy also testified that exigent circumstances necessitated a showup identification of the defendant because an armed robbery involving a firearm had just occurred and the suspects, who had left the scene on foot, could possibly still have other weapons on their person. When questioned by defense counsel on cross-examination, Joy agreed that the police had "show[n] [Brinkley] somebody after a robbery, who was surrounded by the police and medical personnel [while Brinkley was] in the back of a police car, and [that Joy had asked her], is this the guy who did it . . . ?" Finally, Detective Sergeant Michael Cruz, who led the investigation, confirmed that nothing "prevent[ed] [the police from] doing a [photographic array or] a live lineup with the defendant . . . ."

State *v.* McLaurin

For her part, Brinkley testified that she had no memory of the event or the night in question. She testified: "I just got into a car accident. I was unconscious, don't remember. I smoke weed. . . . I do not remember this night . . . ." The prosecutor then showed Brinkley several clips of video footage from Joy's body cam in which Brinkley can be heard identifying Ferguson, identifying the defendant, and discussing the suspects' physical features and clothing. Brinkley confirmed that it was her in the videos but, again, explained that she had no recollection of the captured events. Thereafter, Brinkley also testified that she "[m]ost likely" smoked "weed" on the day of the robbery but ultimately concluded that she did not know for sure if she had done so.

Relevant to this appeal, Dunn was asked by defense counsel at trial whether there was an emergency that necessitated a showup identification. Dunn responded, "[n]o, there was a request from the captain." Defense counsel cross-examined Cruz as to whether "there [was] anything that prevented [the police officers] from doing a [photographic array] of [the defendant] with the witnesses and the employees of [the restaurant]?" Cruz responded that, "for this case," based on "my training and experience, the showup was appropriate. I believe there [was] enough probabl[e] cause on that night to arrest the two [suspects] for the robbery." Cruz subsequently testified on cross-examination that there was nothing that prevented the officers from doing a photographic array with the eyewitnesses. Defense counsel then asked whether there was anything that prevented the officers from doing a lineup with the defendant and the restaurant employees, and Cruz responded, "[n]o."

In a brief ruling denying the motion to suppress, the trial court explained that it has "consider[ed] the testimony of . . . Joy and the testimony of . . . Brinkley . . . and . . . [found] that the identification, given all

State *v.* McLaurin

the facts and circumstances, was not unduly suggestive.'' The trial court subsequently denied the defendant's motion for articulation, which sought, among other things, an explanation as to what subordinate findings the court made to support its conclusion that the identification was not unduly suggestive. At the conclusion of trial, the jury found the defendant guilty on nine of the ten counts, and he was sentenced to twenty-five years of imprisonment, execution suspended after eighteen years, and five years of probation. The Appellate Court subsequently upheld the trial court's denial of the motion to suppress on the basis of the exigent circumstances' exception and affirmed the judgment of conviction. See *State* v. *McLaurin*, supra, 216 Conn. App. 466, 470, 479.

Following the first oral argument heard by this court, we, sua sponte, ordered the trial court to articulate the following: (1) "What subordinate findings did the trial court make to support its determination that Brinkley's identification 'was not unduly suggestive?' In particular, what portions of . . . Joy's and . . . Brinkley's testimony did the court credit and what portions, if any, did the court reject? The court should also articulate any other findings of fact necessary to support its determination." (2) "Assuming the identification was unduly or impermissibly suggestive, articulate whether, under the totality of the circumstances, the identification was still reliable and the facts that support such a conclusion." And (3) "[a]rticulate the factual basis that supports the conclusion that an exigency existed under the circumstances of this case that justified the showup identification."

In its articulation, the trial court reiterated many of the facts of the robbery and subsequent identification procedure to conclude that Brinkley's identification was not unduly suggestive. The court explained that it "credited all of the testimony of . . . Joy and . . .

State *v.* McLaurin

Brinkley and did not reject any of it." It also noted that it took into account Brinkley's frequent marijuana use and the possibility that she was not wearing eyeglasses on the night of the incident. The court concluded that, even if the identification was unduly suggestive, the identification was reliable because it was "conducted in close temporal and geographical proximity to the alleged offense . . . [t]he police provided . . . Brinkley an opportunity to identify the defendant while her memory was still fresh . . . [and] . . . Brinkley identified both suspects quickly and without hesitation."[3] (Citations omitted.) Finally, the court concluded that an exigency existed, given that the police were responding to an armed robbery of a restaurant, that a gun was found on the floor of the restaurant, and that Brinkley stated that, at some unspecified point in time, she saw one of the men holding a gun, before he fled the scene.

I

I agree with the majority that the proper standard for reviewing whether a pretrial identification procedure violates a defendant's due process rights is a mixed question of law and fact subject to our plenary review. See, e.g., *State* v. *Marquez*, 291 Conn. 122, 136–37, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009). "The test for determining whether the state's use of an [allegedly] unnecessarily suggestive identification procedure violates a defendant's federal due process rights derives from the decisions of the

_____

[3] In making its reliability determination, the trial court also noted that it relied on, among other things, the facts that a firearm had been found in the restaurant and that Joy testified that he did not know how many weapons were involved in the incident. The court further explained that, "by conducting the showup identification . . . law enforcement [was able] to quickly eliminate any innocent parties so as to continue the investigation with a minimum of delay." These facts, however, have no bearing on the reliability determination.

State *v.* McLaurin

United States Supreme Court in *Neil* v. *Biggers*, [supra, 409 U.S. 196–97], and *Manson* v. *Brathwaite*, 432 U.S. 98, 113–14, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). As the court explained in *Brathwaite*, fundamental fairness is the standard underlying due process, and, consequently, reliability is the linchpin in determining the admissibility of identification testimony . . . . Thus, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances.” (Citation omitted; internal quotation marks omitted.) *State* v. *Ruiz*, 337 Conn. 612, 621–22, 254 A.3d 905 (2020).

There can be little doubt that the showup identification at issue in the present case was highly suggestive. Without any discussion, the majority agrees that the showup was at least “suggestive” but concludes that it need not decide whether it was *unnecessarily* suggestive because, even if it was, the identification was reliable. Part II of the majority opinion. Because the suggestiveness inquiry dovetails with the reliability inquiry, I begin by analyzing the former issue.[4] We have recog-

---

[4] It bears emphasis that the reliability of an identification in substantial part depends on the identification procedure’s degree of suggestiveness because the latter taints the former. Cf. *Neil* v. *Biggers*, supra, 409 U.S. 198 (“the primary evil to be avoided [by employing a nonsuggestive identification procedure] is a very substantial likelihood of irreparable misidentification” (internal quotation marks omitted)); National Research Council of the National Academies, Identifying the Culprit: Assessing Eyewitness Identification (The National Academies Press 2014) p. 9, available at https://nap.nati onalacademies.org/read/18891/chapter/3 (last visited July 18, 2025) (“Accurate eyewitness identifications may aid in the apprehension and prosecution of the perpetrators of crimes. However, inaccurate identifications may lead to the prosecution of innocent persons while the guilty party goes free. It is therefore crucial to develop eyewitness identification procedures that achieve maximum accuracy and reliability.” (Footnote omitted.)). Indeed, that is the purpose of a proper identification procedure—to make the resulting identification reliable.

State *v.* McLaurin

nized that showup identifications are "inherently and significantly suggestive . . . ." (Internal quotation marks omitted.) *State* v. *Ruiz*, supra, 337 Conn. 622. This observation is based on the commonsense insight that, ordinarily, "a one-to-one confrontation between a [witness] and the suspect presented . . . for identification . . . conveys the message to the [witness] that the police believe the suspect is guilty." (Internal quotation marks omitted.) *State* v. *Revels*, 313 Conn. 762, 772–73, 99 A.3d 1130 (2014), cert. denied, 574 U.S. 1177, 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015). "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Neil* v. *Biggers*, supra, 409 U.S. 198. "For this reason, when not necessary, the presentation of a single suspect to a witness by the police (as opposed to a lineup, in which several individuals are presented to the [witness], only one of whom is the suspect) . . . has . . . been widely condemned . . . ." (Internal quotation marks omitted.) *State* v. *Ruiz*, supra, 622.

I recognize, however, that "the use of a one-on-one showup identification procedure does not invariably constitute a denial of due process, as it may be justified by exigent circumstances." Id. In *Stovall* v. *Denno*, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967), the seminal exigency case, the United States Supreme Court concluded that the showup identification at issue was admissible because it was "the only feasible procedure" when the victim was gravely injured. (Internal quotation marks omitted.) Id., 302. In 1993, in *State* v. *Wooten*, 227 Conn. 677, 686–87, 631 A.2d 271 (1993), this court went well beyond this rationale when it concluded that "enabling the police to focus their investigation and providing the victim an opportunity to identify her assailant while her memory was still fresh . . . were

State *v.* McLaurin

sufficient [exigencies] to prevent the identification procedure from being unnecessarily suggestive.'' *State* v. *Ledbetter*, 275 Conn. 534, 550, 881 A.2d 290 (2005) (overruled in part on other grounds by *State* v. *Harris*, 330 Conn. 91, 191 A.3d 119 (2018)), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006). This court has reached the same conclusion in subsequent cases that involved similar factual circumstances. See, e.g., *State* v. *Revels*, supra, 313 Conn. 773–74; *State* v. *St. John*, 282 Conn. 260, 278–79, 919 A.2d 452 (2007). We have also said, however, that an exigency exists only when the showup procedure ''was *necessary* to allow the police to eliminate quickly any innocent parties so as to continue the investigation with a minimum of delay, if the victim excluded the defendant as a suspect or was unable to identify him.''[5] (Emphasis added; internal quotation marks omitted.) *State* v. *Ruiz*, supra, 337 Conn. 623.

I agree with the defendant that, since *Stovall*, numerous courts, including this one, have incorrectly expanded the scenarios that may constitute an exigency to include many situations in which a showup procedure is not the only feasible identification procedure and that, therefore, do not involve a true exigency. Despite widespread recognition for decades that showups are ''next to worthless''; 4 J. Wigmore, supra, § 1130, p. 214 n.1; thirty-eight years have passed since this court or the

---

[5] The word ''necessary'' has more than one meaning in the law. See, e.g., *New England Pipe Corp.* v. *Northeast Corridor Foundation*, 271 Conn. 329, 336–37, 857 A.2d 348 (2004) (''Webster's Third New International Dictionary defines the term 'necessary' as '[something] that cannot be done without: that must be done or had: absolutely required: essential, indispensable' ''); *West Hartford* v. *Talcott*, 138 Conn. 82, 91, 82 A.2d 351 (1951) (''[n]ecessary, in legislative [a]cts according the right of eminent domain, does not mean an absolute or indispensable necessity, but only that the taking provided for is reasonably necessary'' (internal quotation marks omitted)). Under any definition, it was not necessary for the police to eliminate the suspects with great urgency in the circumstances of this case.

State *v.* McLaurin

Appellate Court has concluded that a showup identification procedure must be suppressed. See *State* v. *Mitchell*, 204 Conn. 187, 200–204, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987).

This court must rein in an ever-expanding meaning of "exigency" that has become so diluted in application that it allows the police to use a showup procedure in nearly all police investigations in which suspects are detained shortly after a crime has occurred, notwithstanding the fact that the resulting identifications are inherently and unnecessarily unreliable. See part II of this opinion. Indeed, in *Stovall*, the United States Supreme Court concluded that the showup identification was admissible because "[n]o one knew how long [the victim] might live . . . [and she] could not visit the jail, [so] the police followed *the only feasible procedure* and took [the suspect] to the hospital room" for the showup. (Emphasis added; internal quotation marks omitted.) *Stovall* v. *Denno*, supra, 388 U.S. 302. In the context of a showup identification, an exigency requires circumstances that render the showup procedure the only feasible option. Administrative convenience is not enough; nor is the mere hypothetical possibility that a dangerous person may remain at large if a showup is not conducted without delay.

In a truly exigent situation—such as when a showup is the only feasible identification procedure in light of a gravely injured witness—the totality of the circumstances may warrant a showup identification, despite the questionable benefit showups provide. As a result, I do not propose any categorical bans on the admission of showup identifications; rather, I would limit the factual circumstances under which an identification obtained by a showup procedure would be admissible at trial. The nature of the exigency must truly necessitate the use of this highly suggestive and unreliable identification procedure. After all, unnecessarily suggestive iden-

State *v.* McLaurin

tification procedures increase the likelihood of misidentification, and that increased chance is gratuitous. See, e.g., *Neil* v. *Biggers*, supra, 409 U.S. 198. Accordingly, I would limit the use of showup identifications to true exigencies, in which there is a demonstrated need for the showup that law enforcement can actually articulate, and which is detailed and specific to the circumstances presented. Generalized concerns for public safety are present in every criminal investigation. By definition, not every investigation can create an exigency. See, e.g., The American Heritage College Dictionary (4th Ed. 2007) p. 489 (defining "exigency" as "[a] pressing or urgent situation"); Ballentine's Law Dictionary (3d Ed. 1969) p. 1021 (defining "public exigency" as "[a] sudden and unexpected happening, an unforeseen occurrence or condition"); see also, e.g., *United States* v. *Hawkins*, 499 F.3d 703, 707 (7th Cir. 2007) (exigency requires "extraordinary urgency"), cert. denied, 555 U.S. 858, 129 S. Ct. 129, 172 L. Ed. 2d 99 (2008); *United States* v. *Concepcion*, 983 F.2d 369, 377 (2d Cir. 1992) (showup may be permissible only when there is "overriding necessity"), cert. denied sub nom. *Frias* v. *United States*, 510 U.S. 856, 114 S. Ct. 163, 126 L. Ed. 2d 124 (1993).

The present case highlights the problems inherent in showup identifications. It is clear that no exigency existed that made a showup identification the only feasible identification procedure. The police admitted that they did not need to conduct a showup, and nothing prevented them from conducting either a lineup or photographic array procedure, as mandated in § 54-1p. Moreover, Brinkley and the other victims were unhurt, the defendant and his accomplice, who had large amounts of cash stuffed in the pockets of his sweatshirt, were in police custody, and the police had recovered a gun in the restaurant. Although I recognize that Joy testified that "you don't know if they're still armed,"

State *v.* McLaurin

such a generalized concern is not sufficient to create an exigent circumstance in which a showup identification is the *only* feasible identification procedure. This is not a situation in which a suspect had used a weapon to seriously injure a victim and then fled with the weapon. Here, the perpetrators used only one gun during the robbery, which was recovered by the police at the scene, and no one was physically injured during the robbery. Accordingly, I conclude that the showup identification procedure in the present case was impermissibly suggestive.

II

Having concluded that Brinkley's showup identification of the defendant was unnecessarily suggestive, I must consider whether the trial court correctly concluded that Brinkley's identification of the defendant was nevertheless reliable under the totality of the circumstances. An identification that is the product of an unnecessarily suggestive identification procedure will nevertheless be admissible, despite the suggestiveness of the procedure, if the identification is reliable in light of all of the relevant circumstances. See, e.g., *State* v. *Marquez*, supra, 291 Conn. 141–42. The defendant contends that "different factors govern reliability under the federal constitution and the state constitution; [see *State* v. *Harris*, supra, 330 Conn. 108, 118–19, 131, 133; and that] Brinkley's identification satisfies neither [test]."[6] I conclude that Brinkley's identification was not reliable.

In *Neil* v. *Biggers*, supra, 409 U.S. 188, the United States Supreme Court set forth the following list of

---

[6] The majority states that it is "skeptical that the defendant truly makes out a reviewable claim under the state constitution . . . ." Part II of the majority opinion. Insofar as the defendant analyzes the factors for determining reliability under our state constitution, which we first articulated in *State* v. *Harris*, supra, 330 Conn. 118–19, 131, 133, I disagree.

State *v.* McLaurin

factors to aid courts in determining whether an unnecessarily suggestive identification is reliable under the federal constitution: "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of his [or her] prior description of the criminal, [4] the level of certainty demonstrated at the [identification], and [5] the time between the crime and the [identification]." *Manson* v. *Brathwaite*, supra, 432 U.S. 114, citing *Neil* v. *Biggers*, supra, 199–200.

Recognizing that the federal constitution establishes a minimum national standard and that states are permitted to afford greater protections, in *State* v. *Harris*, supra, 330 Conn. 91, we considered whether the due process provision of article first, § 8, of the state constitution "affords greater protection than the federal due process clause with respect to the admissibility of an eyewitness identification following an unnecessarily suggestive identification procedure." Id., 114. We concluded, "as a matter of state constitutional law, that it [was] appropriate to modify the *Biggers* framework to conform to recent developments in social science and the law."[7] Id., 115. Accordingly, "we endorse[d] the fac-

---

[7] Given the numerous problems posed by showup identifications, some courts have modified the factors they will consider when deciding if a showup identification is admissible. For example, the Kansas Supreme Court now requires a more thorough analysis of the circumstances under which the identification was made. It considers, among other things, "(1) the opportunity of the witness to view the actor during the event; (2) the witness' degree of attention to the actor at the time of the event; (3) the witness' capacity to observe the event, including his or her physical and mental acuity; (4) whether the witness' identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it correctly." *State* v. *Hunt*, 275 Kan. 811, 817–18, 69 P.3d 571 (2003). I agree with our sister court that these factors "present an approach to the identification issue [that] heightens . . . the reliability of such identification." Id., 818. Nevertheless, these enhanced factors may offer only marginal improvement because the problem remains that the showup procedure is inherently suggestive. See, e.g., T. O'Toole & G. Shay, "*Manson* v. *Brathwaite* Revisited: Towards a New Rule of Decision for Due Process Challenges to Eyewitness Identification Proce-

State *v.* McLaurin

tors for determining the reliability of an identification
that we identified as a matter of state evidentiary law
in *State* v. *Guilbert*, [306 Conn. 218, 253–54, 49 A.3d
705 (2012)]; and we adopt[ed] the burden shifting frame-
work embraced by the New Jersey Supreme Court in
[*State* v. *Henderson*, 208 N.J. 208, 288–89, 27 A.3d 872
(2011)] for purposes of allocating the burden of proof
with respect to the admissibility of an identification that
was the product of an unnecessarily suggestive proce-
dure.''[8] *State* v. *Harris*, supra, 115.

We concluded that a trial court should consider the
eight "estimator variables" identified in *State* v. *Guilb-
ert*, supra, 306 Conn. 253–54, which, we noted, "overlap
considerably with the estimator variables" articulated
by the New Jersey Supreme Court in *Henderson. State*
v. *Harris*, supra, 330 Conn. 133. These variables include
"the following propositions: (1) there is at best a weak
correlation between a witness' confidence in his or her
identification and the identification's accuracy; (2) the
reliability of an identification can be diminished by a
witness' focus on a weapon; (3) high stress at the time

dures,'' 41 Val. U. L. Rev. 109, 122 (2006).

Still other courts have taken a more revolutionary approach to showup
identification procedures. Courts in New York and Massachusetts have
rejected the factor-based analyses employed by the majority of jurisdictions
and have opted instead for a simpler approach. If it is determined that the
initial identification was unduly suggestive, then no further inquiry is needed,
and the identification evidence is excluded. See *Commonwealth* v. *Johnson*,
420 Mass. 458, 462–63, 465, 471–72, 650 N.E.2d 1257 (1995); *People* v. *Adams*,
53 N.Y.2d 241, 250–51, 423 N.E.2d 379, 440 N.Y.S.2d 902 (1981). Both of
these states, however, have recognized exceptions that amount to nothing
more than police convenience and, as a result, swallow the general rule of
inadmissibility. See, e.g., M. Cicchini & J. Easton, "Reforming the Law on
Show-Up Identifications," 100 J. Crim. L. & Criminology 381, 395 n.70 (2010).

[8] "Under *Henderson*, the defendant bears the burden of adducing evidence
indicating that the identification procedure undermined the reliability of the
identification; if the defendant makes such a showing, the state must offer
evidence to demonstrate that the identification nevertheless was reliable
under the totality of the circumstances; if the state adduces such evidence,
the defendant assumes the burden of proving a very substantial likelihood
of misidentification. See *State* v. *Henderson*, supra, 208 N.J. 288–89 . . . .''
(Citation omitted.) *State* v. *Harris*, supra, 330 Conn. 115 n.18.

352 Conn. 500        JULY, 2025        545

State *v.* McLaurin

of observation may render a witness less able to retain
an accurate perception and memory of the observed
events; (4) cross-racial identifications are considerably
less accurate than identifications involving the same
race; (5) memory diminishes most rapidly in the hours
immediately following an event and less dramatically
in the days and weeks thereafter; (6) an identification
may be less reliable in the absence of a double-blind,
sequential identification procedure; (7) witnesses may
develop unwarranted confidence in their identifications
if they are privy to postevent or postidentification infor-
mation about the event or the identification; and (8)
the accuracy of an eyewitness identification may be
undermined by unconscious transference, which
occurs when a person seen in one context is confused
with a person seen in another.'' (Internal quotation
marks omitted.) Id., 118–19, quoting *State* v. *Guilbert*,
supra, 253–54. Importantly, we emphasized that ''these
variables are neither 'exclusive' nor 'frozen in time.' ''
*State* v. *Harris*, supra, 134.

Our decision in *Harris* relied in large part on our
understanding of the developments in the science
behind eyewitness identifications. We now know that
eyewitness identification is the leading cause of wrong-
ful convictions. See, e.g., *Tatum* v. *Commissioner of
Correction*, 349 Conn. 733, 736–37, 322 A.3d 299 (2024);
*State* v. *Guilbert*, supra, 306 Conn. 248–50. In one study,
''three fourths of . . . convictions of innocent persons
involved mistaken eyewitness identifications . . . .''
(Citation omitted; internal quotation marks omitted.)
*State* v. *White*, 334 Conn. 742, 778, 224 A.3d 855 (2020).
In fact, numerous studies ''have confirmed that eyewit-
ness testimony is often hopelessly unreliable.'' *Com-
monwealth* v. *Johnson*, 420 Mass. 458, 467, 650 N.E.2d
1257 (1995). We know that eyewitness identification
testimony is untrustworthy due to ''the many vagaries
of memory encoding storage and retrieval; the mallea-

State *v.* McLaurin

bility of memory, the contaminating effects of extrinsic information; the influence of police interview techniques and identification procedures; and . . . other factors . . . .'' (Internal quotation marks omitted.) *State* v. *Harris*, supra, 330 Conn. 130.

Research has shown that ''[showups] are the *least reliable* of all the identification procedures, and their use further increases the incidence of wrongful convictions.'' (Emphasis added.) M. Cicchini & J. Easton, ''Reforming the Law on Show-Up Identifications,'' 100 J. Crim. L. & Criminology 381, 381 (2010). Showups have even ''been called the most grossly suggestive identification procedure now or ever used by the police.'' (Internal quotation marks omitted.) *People* v. *Sammons*, 505 Mich. 31, 41–42, 949 N.W.2d 36 (2020). Empirical findings demonstrate that innocent suspects are more often identified in showups than lineups. Id., 44. Unlike a lineup or a photographic array, a showup pressures the eyewitness to identify ''the individual [who] has been singled out as the suspect by law enforcement''; *Morales* v. *United States*, 248 A.3d 161, 172–73 (D.C. 2021); and leaves no room for error. See, e.g., *People* v. *Sammons*, supra, 44 (''in a showup, any mistaken identification will fall on the suspect''). As a result, identifications obtained through a showup procedure are ''less reliable than properly administered lineup identifications . . . .'' *State* v. *Lawson*, 352 Or. 724, 742–43, 291 P.3d 673 (2012). This court has also recognized the problems with showup identifications. See, e.g., *State* v. *Wooten*, supra, 227 Conn. 686 (''almost any one-to-one confrontation between a victim of a crime and a person whom the police present as a suspect is presumptively suggestive . . . because it conveys the message to the victim that the police believe the suspect is guilty'' (citation omitted; internal quotation marks omitted)).

352 Conn. 500 JULY, 2025 547

State *v.* McLaurin

Still more troublesome, as we acknowledged in *Harris*, is the fact that the approach used to evaluate the reliability of showups under the federal constitution "employs a malleable and outdated [facts and circumstances] analysis [using the *Biggers* factors]. As a result, unreliable [showup] evidence is routinely used against defendants in criminal trials."[9] M. Cicchini & J. Easton, supra, 100 J. Crim. L. & Criminology 381; see also, e.g., P. Nardulli, "The Societal Costs of the Exclusionary Rule Revisited," 1987 U. Ill. L. Rev. 223, 226 (discussing research showing that motions to suppress identifications are rarely granted). These malleable analyses tend to "[confuse] exigency with police convenience." M. Cicchini & J. Easton, supra, 402. The *Biggers* factors often fail to weed out unreliable identifications because these factors do not accurately assess reliability. See, e.g., id., 392 ("[s]ocial science research . . . has shown that most of the *Biggers* factors do not accurately measure reliability and, therefore, do not address the risk of misidentification"). We acknowledged as much in *Harris*, explaining that "*Guilbert* supports the proposi-

_____

[9] The pitfalls of showup identifications are not confined to the wrongful conviction of an innocent person—which would be severe enough to warrant extreme caution by itself. For example, when a witness makes a false identification during a showup procedure, the innocent suspect will very likely be arrested and prosecuted, and law enforcement will stop looking for the perpetrator. See, e.g., M. Cicchini & J. Easton, supra, 100 J. Crim. L. & Criminology 390; see also, e.g., K. Findley, "Toward a New Paradigm of Criminal Justice: How the Innocence Movement Merges Crime Control and Due Process," 41 Tex. Tech L. Rev. 133, 138 (2008); cf. Conn. Joint Standing Hearings, Judiciary, Pt. 7, 2011 Sess., p. 2034 ("Misidentification . . . harms everyone, not just the innocent who suffer the unique horror of wrongful conviction. It harms the police who find that their investigations are impeded . . . . It really harms prosecutions because when investigations are refocused the witness is rendered unusable . . . . And the community suffers because the real perpetrator is at large."). In contrast, with a lineup or a photographic array, if the witness makes an incorrect identification, she will identify an individual that the police know was purposefully inserted as a filler. E.g., M. Cicchini & J. Easton, supra, 390–91. As a result, "the [witness'] misidentification will be known to the police, who can then continue with their investigation and their search for the true perpetrator." Id., 391.

State *v.* McLaurin

tion that, under our state constitution, the *Biggers* analysis is inadequate to prevent the admission of unreliable identifications that are tainted by an unduly suggestive procedure." *State* v. *Harris*, supra, 330 Conn. 121. Unfortunately, not only are showup identifications unreliable, and not only do the analyses used for determining their admissibility under the federal constitution provide little protection for a criminal defendant, but juries also find eyewitness identifications highly persuasive. See, e.g., M. Cicchini & J. Easton, supra, 411; see also, e.g., *State* v. *Guilbert*, supra, 306 Conn. 241–42.

In *Harris*, this court noted that another justification for concluding that our state constitution affords greater protection than the federal constitution was that our legislature has recognized the pervasive issue of misidentification. See *State* v. *Harris*, supra, 330 Conn. 134 n.32. In 2011, the legislature addressed the significant pitfalls of eyewitness identifications by mandating specific procedures for identifications that are conducted by the state or municipal police in No. 11-252, § 1, of the 2011 Public Acts (P.A. 11-252), titled "An Act Concerning Eyewitness Identification." See General Statutes § 54-1p (c) (requiring, among other things, that identification procedures be double-blind and that they include minimum number of "fillers" who fit suspect's description). As we have explained, § 54-1p "demonstrates a clear legislative concern that suggestive identification procedures are a significant cause of erroneous convictions and should be eliminated to the extent possible." (Internal quotation marks omitted.) *State* v. *Harris*, supra, 134 n.32. One of the vice chairpersons of the Judiciary Committee remarked that, "[a]s many members of the [c]hamber may know . . . in cases [in which] we have wrongful identification, about 75 percent of them have to do with the procedure for having a witness identify what would be a potential perpetrator. This bill looks to incorporate into our statutes the latest

State *v.* McLaurin

scientific and best procedures.'' 54 H.R. Proc., Pt. 23, 2011 Sess., pp. 7812–13, remarks of Representative Gary A. Holder-Winfield. Similarly, retired Justice David M. Borden testified before the Judiciary Committee, explaining that ''we now know because of the many DNA exonerations in the past several years, that in the area of eyewitness identification we are doing something wrong. Of the approximately 270 DNA exonerations nationwide in the past several years, including several in Connecticut, more than 75 percent involve positive yet false eyewitness identifications.'' Conn. Joint Standing Hearings, Judiciary, Pt. 6, 2011 Sess., p. 1809. Senator Looney testified that, as a result of the highly inaccurate nature of eyewitness identifications, ''we have an obligation to [e]nsure that [eyewitness] testimony is as accurate as possible.''[10] Id., p. 1910. Overreliance on showup identifications frustrates the legislature's purpose of reducing the number of wrongful convictions based on suggestive identification procedures. See, e.g., *State* v. *Harris*, supra, 134 n.32.

We noted in *Harris* that, as the cognitive science of eyewitness identification has developed, so, too, has our jurisprudence. See id., 118–21. In *State* v. *Guilbert*, supra, 306 Conn. 218, we determined that ''expert testimony on eyewitness identification is admissible upon a determination by the trial court that the expert is qualified and the proffered testimony is relevant and will aid the jury.'' Id., 226. In doing so, we overruled earlier decisions from this court that held that the factors affecting eyewitness identification are within the

[10] A primary focus of the legislature in discussing P.A. 11-252, § 1, was whether, when showing an eyewitness a photographic array, the police should present the photographs sequentially or simultaneously. See, e.g., Conn. Joint Standing Hearings, Judiciary, Pt. 7, 2011 Sess., p. 2018. There was broad consensus that ''the . . . single most important issue . . . seems to . . . [be] the [double-blind] administration'' of the photographic array. Id.; see also id., p. 2022. Even in 2011, showups were presumably so unreliable that legislators did not envision that practice being a significant part of criminal investigations and did not significantly address the practice.

State *v.* McLaurin

knowledge of an average juror. See id., 234–53. We reasoned that our prior case law was "out of step with the widespread judicial recognition that eyewitness identifications are potentially unreliable in a variety of ways unknown to the average juror. This [broad-based] judicial recognition tracks a near perfect scientific consensus. The extensive and comprehensive scientific research, as reflected in hundreds of peer reviewed studies and meta-analyses, convincingly demonstrates the fallibility of eyewitness identification testimony and pinpoints an array of variables that are most likely to lead to a mistaken identification." (Footnotes omitted.) Id., 234–36.

Four years later, in *State* v. *Dickson*, 322 Conn. 410, 141 A.3d 810 (2016), cert. denied, 582 U.S. 922, 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017), we further developed protections against inherently suggestive identifications. We concluded that "*any* [first-time] in-court identification by a witness who would have been unable to reliably identify the defendant in a nonsuggestive out-of-court procedure constitutes a procedural due process violation." (Emphasis in original.) Id., 426 n.11.

Finally, just last year, this court expanded the framework set forth in *Teague* v. *Lane*, 489 U.S. 288, 299–314, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989) (plurality opinion), for evaluating whether a new rule applies retroactively on collateral review by adopting a third exception to the *Teague* rule of nonretroactivity. See *Tatum* v. *Commissioner of Correction*, supra, 349 Conn. 752–53. In *Tatum*, we concluded that, "[g]iven the developments in the science of eyewitness identification, the heightened risk of a wrongful conviction, and the fact that the petitioner raised eyewitness identification claims in his direct appeal . . . the rule articulated in *Dickson* must be applied retroactively on collateral review in the petitioner's case." Id., 763–64. Ongoing advancements in our understanding of the science

State *v.* McLaurin

behind eyewitness identifications serves only to bolster our reasoning in *Harris*, and many of the cases decided by this court prior to the legislature's adoption of § 54-1p should be reexamined and viewed through the lens of the public policy of the statute.

Applying the estimator variables that this court adopted in *Harris* to the present case, I conclude that, at the time of the identification, Brinkley was scared and probably "high," could not see the perpetrators' faces, may not have been wearing her eyeglasses, and, at trial, had no memory of the incident or the defendant. During the robbery, Brinkley was clearly, and understandably, terrified. She was described as "screaming . . . 'oh my fucking God, I'm so fucking scared. We're going to die.' " Science tells us that the reliability of an eyewitness identification can be diminished by a witness' focus on a weapon and that high stress at the time of the observation may render a witness less able to retain an accurate memory of the observed events. See, e.g., *State* v. *Guilbert*, supra, 306 Conn. 253. Thus, the second and third estimator variables support the defendant's contention that the identification was not reliable. See id.; see also *State* v. *Harris*, supra, 330 Conn. 118–19, 133. What's more, Brinkley testified that she "[m]ost likely" smoked "weed" on the day of the robbery. We know that a "witness' drug use . . . at the time of the events in question . . . place[s] the issue of the witness' ability to perceive and to recall, and, ultimately, the witness' credibility, before the jury." (Footnote omitted.) *State* v. *Clark*, 260 Conn. 813, 823–24, 801 A.2d 718 (2002). The suspects were also wearing masks, which hid most of their faces from Brinkley's view. A perpetrator's wearing a mask "weigh[s] against reliability." *United States* v. *Garcia-Alvarez*, 541 F.3d 8, 14 (1st Cir. 2008). Brinkley also testified: "I just got into a car accident. I was unconscious, don't remember. . . . I do not remember this night . . . ." After viewing

State *v.* McLaurin

the clips of footage from Joy's body cam, in which she can be heard identifying the defendant, Brinkley confirmed that it was her in the videos but again explained that she had no recollection of the captured events. Finally, the first and sixth estimator variables also support a conclusion that the identification was unreliable because there is a weak correlation between Brinkley's confidence in her identification and the identification's accuracy, and the showup procedure was, of course, not a double-blind, sequential procedure. See, e.g., *State* v. *Guilbert*, supra, 253; see also *State* v. *Harris*, supra, 118–19, 133. Accordingly, guided by the estimator variables, I conclude that Brinkley's identification, which was the product of an unnecessarily suggestive procedure, was unreliable under our state constitution.

Despite the numerous indicia of unreliability, the majority concludes, on the basis of its analysis of the *Biggers* and *Harris* factors, that Brinkley's identification was sufficiently reliable to avoid any due process violation. See part II of the majority opinion. As I explained, showup identifications are "hopelessly unreliable." *Commonwealth* v. *Johnson*, supra, 420 Mass. 467. This case highlights why. The majority concludes that the first *Biggers* factor—the opportunity of the eyewitness to view the criminal at the time of the crime; see *Neil* v. *Biggers*, supra, 409 U.S. 199; weighs in favor of reliability. See part II of the majority opinion. The majority so concludes, even though Brinkley may not have been wearing her eyeglasses and the suspects were wearing masks during the robbery. The majority overcomes these facts, reasoning that "Brinkley was in the front of the restaurant when Ferguson and the defendant entered, and that she then went into the back of the restaurant with them and stood next to the defendant while Ferguson ordered [one of the employees] to open the safe." Id. The majority also notes that the trial court articulated that Joy testified that he chose

State *v.* McLaurin

Brinkley to participate in the identification "because she was the employee closest to the front of the [restaurant, who] encountered the suspects first . . . ." (Internal quotation marks omitted.) Id. But proximity to a suspect is of little consequence when the suspect was wearing a mask.

As to the second *Biggers* factor, the majority concludes that Brinkley's "degree of attention" weighs in favor of reliability. Id.; see *Neil* v. *Biggers*, supra, 409 U.S. 199. In reality, Brinkley's "degree of attention" lends little support for reliability given that she was understandably terrified. See, e.g., *State* v. *Guilbert*, supra, 306 Conn. 253 (reliability of eyewitness identification can be diminished by eyewitness' focus on weapon and high stress). Employing the fourth *Biggers* factor, the majority also concludes that Brinkley's certainty that she was correctly identifying the perpetrator weighed in favor of reliability. See part II of the majority opinion; see *Neil* v. *Biggers*, supra, 199. Specifically, the majority concludes that "Brinkley's statements in the [police] body cam footage reveal that, at the time she identified the defendant, she did so with great certainty." Part II of the majority opinion. But it is now well established that "there is at best a weak correlation between a witness' confidence in his or her identification and the identification's accuracy . . . ." (Internal quotation marks omitted.) *State* v. *Harris*, supra, 330 Conn. 118.

Even if the third and fifth *Biggers* factors—the accuracy of Brinkley's prior description of the defendant and the amount of time between the crime and the identification; see *Neil* v. *Biggers*, supra, 409 U.S. 199– 200; weigh in favor of reliability, on balance, I cannot conclude that Brinkley's identification was reliable, even under the federal constitution. In sum, despite knowing that showup identifications are "next to worthless"; 4 J. Wigmore, supra, § 1130, p. 214 n.1; the majority

State *v.* McLaurin

concludes that an identification in which the eyewitness was scared and probably "high," may not have been wearing her eyeglasses, could not see the perpetrators' faces and, at trial, had no memory of the incident or the defendant, was reliable. I simply cannot agree.

The admission of a suggestive and unreliable identification requires reversal of a defendant's conviction unless the state establishes that it was harmless beyond a reasonable doubt. See, e.g., *State* v. *Artis*, 314 Conn. 131, 149, 156–57, 101 A.3d 915 (2014). This requires the state to prove that there was "strong, independent evidence of the defendant's guilt." Id., 157. If, however, the improperly admitted identification "may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.) Id., 159. No strong, independent evidence of guilt exists in this case. Brinkley's unnecessarily suggestive and unreliable identification was the only identification of the defendant as one of the perpetrators. No physical evidence connected the defendant to the crime. In fact, the state laboratory eliminated the defendant as a source of DNA "from all [of] the evidence that [the laboratory] was able to make comparisons to," including the interior of one of the ski masks, the magazine of the discarded gun, the kitchen knife, and the drawer of the cash register. I cannot conclude that the state has established that the improperly admitted identification had no tendency to influence the judgment of the jury. Accordingly, I would reverse the judgment of the Appellate Court and order a remand of the case for a new trial.

### CONCLUSION

"It is estimated [that] . . . more than 10,000 people a year [are] wrongfully convicted, most of whom were convicted as a result of a mistaken identification." S. Gambell, Comment, "The Need to Revisit the *Neil* v.

State *v.* McLaurin

*Biggers* Factors: Suppressing Unreliable Eyewitness Identifications,'' 6 Wyo. L. Rev. 189, 190–91 (2006). Even the more "reliable" eyewitness identification procedures are hopelessly unreliable. A showup identification procedure is even less reliable, which makes poor quality evidence even worse and increases the likelihood that this procedure will result in false identifications and wrongful convictions. It has long been a fundamental value determination of our society that "it is far worse to convict an innocent man than to let a guilty man go free." *In re Winship*, 397 U.S. 358, 372, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (Harlan, J., concurring). I agree. Not only are showups much more likely to result in wrongful convictions than other forms of identification, but showups conducted in situations that are not truly exigent, such as the present case, do not sufficiently serve the public interests of ensuring the safety of residents and holding guilty perpetrators to account. Thus, they have limited value in our criminal justice system. I cannot sanction the broad admissibility of showup identifications and would, instead, limit the admissibility of such identifications to true exigencies, in which a showup was the only feasible identification procedure. I also cannot subscribe to the majority's conclusion that the identification at issue in the present case was reliable because, on balance, the facts point, unmistakably, in the opposite direction—toward unreliability. With concern for the number of wrongfully convicted citizens in this state, I respectfully dissent.